IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


DARREYL YOUNG-GIBSON,                          )
                                               )
                                               )
                        Plaintiff,             )
                                               )
            v.                                 )      No.  11 C 8982
                                               )
BOARD OF EDUCATION OF THE CITY                 )      Judge Virginia M. Kendall
OF CHICAGO,                                     )
                                               )
                        Defendant.             )


## MEMORANDUM OPINION AND ORDER

Plaintiff Darreyl Young-Gibson filed suit against Defendant Board of Education of the

City of Chicago (the "Board") pursuant to Title VII of the Civil Rights Act of 1964, as amended

by 42 U.S.C. § 2000e *et seq.*  Young-Gibson is the former principal of Percy Julian High School

("Julian") and was terminated from her position in October 2009.  Young-Gibson alleges the

Board terminated her employment because of her race and gender (Count I), and retaliated

against her for writing a letter rescinding the suspension of a Julian employee, allegedly to

oppose discrimination. (Count II).  The Board moves for summary judgment on both counts.  For

the reasons stated herein, the Board's Motion for Summary Judgment is granted.

## STATEMENT OF MATERIAL UNDISPUTED FACTS[1]

Young-Gibson was hired by the Board of Education of the City of Chicago as a substitute

teacher in 1972.  (Complaint, Dkt. No. 1, p.7).   In January 2008, Young-Gibson became

---

[1] Throughout this Opinion, the Court refers to the Parties' Local Rule 56.1 Statements of Undisputed Material Facts as follows: citations to the Board's Statement of Undisputed Facts (Dkt. No. 35) have been abbreviated to "Def. 56.1 St. ¶ __"; citations to Young-Gibson's Amended Response to Defendant's Statement of Undisputed Fact (Dkt. No. 51) have been abbreviated to "Pl. 56.1 St. ¶  __".

principal of Julian. (Def. 56.1 St. ¶ 2.)  Prior to becoming principal of Julian, Young-Gibson had never been a principal or an assistant principal in any school district, including the Chicago Public Schools ("CPS").  (*Id.* ¶ 4.)  Jerrelyn Jones was the CPS's designee to oversee and assess the performance of principals and administrators at high schools in her assigned area. (*Id.* ¶¶ 5–7.)  Jones was Young-Gibson's immediate supervisor during the entirety of Young-Gibson's tenure as principal of Julian. Jones also supervised approximately 14–15 other principals. (*Id.* ¶ 7.)  Jones reported to David Gilligan, the Chief Officer of High School Programs.  (*Id.* ¶ 8).

## I.     Young-Gibson's Tenure as Principal of Julian

When Young-Gibson became principal, Julian was on probation under the CPS "School Probation and Remediation Policy." (Pl. 56.1 Resp. ¶ 44, Ex. 32.)  In addition, the Illinois State Board of Education ("ISBE") had been monitoring Julian's recognition status due to persistent failures to provide special education services to students and to create and maintain a safe school climate.  (Def. 56.1 St. ¶ 44.)  In order to address these issues, the Board provided Julian with additional resources and assistance but denied a request by Young-Gibson asking for additional security.  (Def. 56.1 St. ¶ 45; Pl. 56.1 Resp. ¶ 45.)

In February 2008, Jones disciplined Young-Gibson for insubordination for refusing to cooperate with the Department of Safety and Security and the Office of High School Programs. (Def. 56.1 St. ¶ 46.)  Young-Gibson also received a 20-day suspension in February 2008 for her attempt to rescind the decision of then-CEO Arne Duncan to suspend a Julian employee pending the outcome of a formal investigation of allegations that the employee had an inappropriate relationship with a female student. (*Id.* ¶ 47.)  Specifically, Young-Gibson directed the employee to return to work and wrote a letter to Duncan informing him that she was unilaterally rescinding the suspension. (*Id.* ¶ 48.)  The Notice of Disciplinary Action provided to Young-Gibson cited a

failure to carry out a directive, repeated or flagrant acts of misconduct, inattention to duty, and insubordination. (Pl. 56.1 Resp. ¶ 46, Ex. 34.)  The Notice also provided Young-Gibson a "Suggestion of Improvement" stating that Young-Gibson "must work with the Climate Team and cooperate with the Office of High School Programs, Department of Safety and Security, and the Area Instruction Office." (*Id.*)  The Notice further advised Young-Gibson that "[a]ll directives from the Chief Executive Officer must be followed." (*Id.*)  The Julian employee Young-Gibson attempted to rescind from suspension was eventually absolved of the formal allegations by the Department of Children and Family Services.  (Pl. 56.1 Resp. ¶ 46).  On April 23, 2008, Duncan recommended and the Board approved and issued a Warning Resolution regarding her insubordination towards Jones and her attempt to rescind Duncan's employment decision.  (Def. 56.1 St. ¶ 48).

In September and October 2008, Jones's office received several telephone calls and emails from parents of Julian students complaining that they could not get in touch with Young-Gibson or her designee. (*Id.* ¶ 49.)  The parents complained that students were not being enrolled in classes, did not have textbooks, that school security personnel had "put their hands" on a student, and that a parent had waited for an hour and a half to meet with Young-Gibson only to never see her. (*Id.* ¶ 50, Ex. 7-C.)  In November 2008, Jones disciplined Young-Gibson again for insubordination because Young-Gibson had not implemented Jones' directives or responded to phone calls from parents of Julian students in a timely manner.  (*Id.* ¶ 52, Ex. 7-D.).  Young-Gibson was provided a pre-discipline hearing on November 10, 2008. (*Id.* ¶ 52.)  Following the hearing, Jones issued Young-Gibson a 10-day unpaid suspension. (*Id.* ¶ 53.)  The Discipline Hearing Summary cited Young-Gibson for negligently failing to carry out a rule order, repeated flagrant acts of misconduct, inattention to duty, and insubordination. (*Id.* ¶ 52, Ex. 7-D.)

On September 11, 2008, the ISBE changed Julian's status from "fully recognized" to "recognized pending further review." (*Id.* ¶ 54, Ex. 7-E.) The ISBE cited "issues directly related to school climate, life safety, leadership, and IEP implementation." (*Id.*) The "recognized pending further review" status is assigned to schools that exhibit areas of noncompliance that are not serious enough to warrant probation and may be correctable prior to the end of the school year following the school year in which they are identified. (*Id.*) If the ISBE designates a school as "non-recognized," that school becomes ineligible to receive state funding and would be forced to close. (*Id.* ¶ 54.)

On March 24, 2009, the ISBE informed then CEO Ron Huberman and Young-Gibson that Julian was being placed on its "Probation" status, citing "evidence of ongoing failure to serve students according to relevant legal and regulatory standards and prolonged noncompliance with legal and regulatory requirements in the area of Special Education Services." (*Id.* ¶¶ 55, 58, Ex. 7-F.) The ISBE indicated that this status was assigned because of Julian's ongoing failure to comply with relevant legal and regulatory standards. (*Id.* ¶ 56.) The ISBE advised that Julian would have 60 days to submit a plan for correction of identified deficiencies. (*Id.* ¶ 57, Ex. 7-F.).

## II.    Young-Gibson's Reassignment

In April 2009, Young-Gibson was reassigned from Julian to an administrative office, specifically Area Office 23. (*Id.* ¶ 17.) After her reassignment, Young-Gibson continued to receive her full salary and benefits but no longer received a travel allowance. (Def 56.1 St. ¶ 21; Pl. 56.1 Resp. ¶ 21). Young-Gibson did not complain to any Board supervisors about her belief that her reassignment to an administrative office was discriminatory. Instead, she complained to the Local School Council ("LSC"), Julian's individual governing body. (Def. 56.1 St. ¶ 20; Pl. 56.1 Resp. ¶ 20). The LSC has the responsibility of performing an evaluation of the principal

each year and began the evaluation of Young-Gibson in late March of 2009. (Pl. 56.1 Resp. ¶ 61, Ex. 38.)  Due to Young-Gibson's reassignment, however, the LSC was unable to complete its evaluation of Young-Gibson. (*Id.*)  Nevertheless on May 7, 2009, Larry McDonald, the Julian LSC Chairperson, sent Huberman a letter requesting that Huberman to take steps to remove Young-Gibson as principal of Julian.  (Def. 56.1 St. ¶ 61, Ex. 7-G.).  McDonald's stated reasons for its request included safety and security issues, Young-Gibson's failure to implement the school improvement plan, her refusal to collaborate with faculty, and the school's low morale. (*Id.* ¶ 63, Ex. 7-G.)  McDonald also noted that the letter was the product of an incomplete evaluation due to Young-Gibson's unforeseen reassignment. (*Id.*)

### III.    Termination of Young-Gibson's Principalship

Pursuant to Young-Gibson's contract, she could be removed as principal before the expiration of her contract term if she failed to make adequate progress in correcting Julian's academic deficiencies.  (*Id.* ¶ 65).  Julian students performed well below district averages according to student performance data.  (*Id.* ¶ 75).  Based on the 2008 and 2009 school years' performance benchmarks, Julian only achieved 30.6 percent of available "performance points" and had not shown sustained academic improvement.  (*Id.* ¶ 77.)  On July 20, 2009, Huberman informed Young-Gibson that he was considering removing her from her position at Julian and terminating her principal contract.  (*Id.* ¶ 64).  Huberman proposed a hearing date of July 30, 2009 to consider Young-Gibson's termination but Young-Gibson's then-attorney requested and was granted a continuance of that hearing.  (*Id.* ¶¶ 34–35.)  The hearing was held on August 24, 2009. (*Id.* ¶ 36.)

Officer Fredrick Bates presided over the hearing.  (*Id.* ¶ 37).  During the hearing, Huberman presented his reasons for why he was considering asking the Board to remove Young-

Gibson from her principalship through documents and witnesses. (*Id.* ¶ 36). Both Jones, Young-Gibson's immediate supervisor, and Ryan Crosby, the Manager of School Performance, provided testimony during that hearing. (*Id.*) Young-Gibson, who was represented by counsel of her choice, called an Illinois state representative, two Julian LAS members, a Julian teacher, and a detective with the Chicago Police Department. (*Id.* ¶ 38; ¶ 39). At the conclusion of the hearing, Bates allowed the record to remain open until the close of the next business day, providing either party an opportunity to submit additional documentation in support of its position. (*Id.* ¶ 40). On September 14, 2009, Bates issued an 86-page report supporting Huberman's proposal to remove Young-Gibson from her principalship. (*Id.* ¶ 42). After a review of the hearing officer's findings of fact and conclusions, Huberman asked the Board to terminate Young-Gibson's principalship at Julian. (*Id.* ¶ 66.)

## IV. Young-Gibson's Proceedings in State Court[2]

On December 4, 2009, Young-Gibson filed a complaint for administrative review in the Circuit Court of Cook County seeking reversal of the Board's decision to terminate her employment. *See Young-Gibson v. Board of Ed. of City of Chicago*, 09 CH 48425; Dkt. No. 34, Ex. A. The complaint also contained a second count alleging the Board breached its employment contract with her. (Dkt. No. 34, Ex. A, p. 2.) On May 25, 2010, the Circuit Court issued an order that converted the administrative review count to a *writ of certiorari*, dismissed

---

[2] The Board did not include facts pertaining to the state court proceedings in its Rule 56.1 Statement of Facts. Instead, the Board asks the Court to take judicial notice of several state court documents detailing those proceedings, attached as Exhibits A-H of the Board's Memorandum in Support of Summary Judgment (Dkt. No. 34.) Pursuant to Federal Rule of Evidence 201(b), a court may take judicial notice of adjudicative facts that are both "not subject to reasonable dispute" and are either (1) "generally known within the territorial jurisdiction of the trial court" or (2) "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201(b). Court records are appropriate subjects for judicial notice because they are sources "whose accuracy cannot reasonably be questioned." *General Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1081 (7th Cir. 1997). Accordingly the Court takes judicial notice of these documents.

Huberman as a defendant with prejudice, and issued a continuance with respect to the Board's motion to dismiss Young-Gibson's breach of contract claim. (Dkt. No. 34, Ex. B.) On October 25, 2010, the state court found in favor of Young-Gibson, finding that the board was required to, but did not, follow the procedural requirements set forth in Sections 34-85 (105 ILCS 5/34-85) and 34-8.3 (105 ILCS 5/34-8.3) of the School Code before terminating Young-Gibson's employment. (Dkt. No. 34, Ex. C.) The court ordered that Young-Gibson be reinstated to her position as principal of Julian. (*Id.*) The Board sought and was granted interlocutory appeal.

On appeal, the Illinois Appellate Court reversed the trial court's order and upheld the Board's decision to terminate Young-Gibson's employment. *Young-Gibson v. Board of Educ. v. City of Chicago*, 959 N.E.2d 751, 764 (Ill. App. Ct. 2011). The appellate court found that the Board had complied with the Sections 34-8.3(a), (b) and (c) of the School Code and that the trial court had erred in holding that the Board was required to comply with Section 34.85. *Id.* The Illinois Appellate Court also denied Young-Gibson's petition for rehearing. (Dkt. No. 34, Ex. G.) On March 28, 2012, the Illinois Supreme Court denied Young-Gibson's petition for leave to appeal. (*Id.*, Ex. H.); *Young-Gibson v. Board of Educ. of City of Chicago*, 968 N.E.2d 89 (Table). After exhausting her administrative remedies through the Illinois Department of Human Rights, Young-Gibson filed suit in federal court on December 19, 2011. (Dkt. No. 1.)

**STANDARD OF REVIEW**

Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the

motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14 (1986). However, the Court will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. Of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000). Where a proposed statement of fact is supported by the record and not adequately rebutted by the opposing party, the Court will accept that statement as true for the purposes of summary judgment. An adequate rebuttal requires a citation to specific support in the record; an unsubstantiated denial is not adequate. *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted."). As the party opposing the motion for summary judgment, Young-Gibson "gets the benefit of all facts that a reasonable jury might find." *Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 314 (7th Cir. 2011). However, she cannot rely on mere conclusions and allegations to create factual issues. *Bladerston v. Fairbanks Morse Engine Div. Of Coltec Ind.*, 328 F.3d 309, 320 (7th Cir. 2003). Nor can speculation be used "to manufacture a genuine issue of fact." *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) (citing *Amadio v. Ford Motor Co.*, 238 F.3d 919, 927 (7th Cir. 2001)).

## <u>DISCUSSION</u>

### I.     Res Judicata

The Board first argues that Young-Gibson's claims are barred under the doctrine of res judicata based on her proceedings before the Circuit Court of Cook County and the Illinois

Appellate Court. Res judicata, also known as "claim preclusion," requires litigants to "join in a single suit all legal and remedial theories that concern a single transaction." *Roboserve, Inc. v. Kato Kagaku Co., Ltd.*, 121 F.3d 1027, 1034 (7th Cir. 1997) (quoting *Perkins v. Board of Trustees of the Univ. of Ill.*, 116 F.3d 235, 236 (7th Cir. 1997)). The purpose of res judicata is to minimize "the expense and vexation attending multiple lawsuits, conserve[] judicial resources, and foster[] reliance on judicial action by minimizing the possibility of inconsistent decisions." *Montana v. United States*, 440 U.S. 147, 153–54 (1979).

In determining whether the doctrine of res judicata applies based on a state court judgment, a federal court should "apply the preclusion law of the state that rendered the judgment …." *Hicks v. Midwest Transit, Inc.*, 479 F.3d 468, 471 (7th Cir. 2007) (citations omitted). Under Illinois law, the doctrine of res judicata bars a subsequent suit if: (1) there is an identity of cause of action; (2) there was a final judgment on the merits rendered by a court of competent jurisdiction; and (3) there is an identity of parties or their privies. *Nowak v. St. Rita High School*, 757 N.E.2d 471, 477 (Ill. 2001); *Pirela v. Village of N. Aurora*, 935 F.2d 909, 911 (7th Cir. 1991). Young-Gibson disputes only the first and second elements; it undisputed that the parties in both proceedings are identical.

### A. Identity of Causes of Action

With respect to the first requirement, Illinois courts have developed the transactional test to determine whether there is an identity of causes of action. *River Park, Inc. v. City of Highland Park*, 703 N.E.2d 883, 891 (Ill. 1998). Under the transactional test, "the assertion of different kinds of theories of relief still constitutes a single cause of action if a single group of operative facts give rise to the assertion of relief." *Id.* (quoting *Baird & Warner, Inc. v. Addison Industrial Park, Inc.*, 387 N.E.2d 831, 838 (Ill. 1979). "The mere fact that different claims are alleged is

immaterial." *Baird*, 387 N.E.2d at 838. The factual allegations in this case are based on the same operative facts as those presented in Young-Gibson's state court proceedings. In both the state and federal proceedings, Young-Gibson alleges the Board improperly terminated her employment as principal of Percy Julian High School.

Young-Gibson argues that there is no identity of causes of action between the two proceedings because of the difference in relief sought. Specifically, Young-Gibson points to the fact that the state court case sought reinstatement pursuant to a *writ of certiorari* for the Board's alleged failure to apply Illinois law when it removed her from her position while her federal claims allege discrimination and unlawful retaliation. Under the transactional test, however, the relevant inquiry under res judicata is whether two causes of action arise from a "single group of operative facts," not whether they seek the same form of relief. *River Park*, 703 N.E.2d at 891–92.

Before the Illinois Supreme Court's decision in *River Park*, Illinois courts were free to apply either the transactional test or the "same evidence" test in determining whether two causes of action are the same for res judicata purposes. *Garcia*, 360 F.3d 630. The "same evidence" test provides that a "second suit is barred 'if the evidence needed to sustain the second suit would have sustained the first, or if the same facts were essential to maintain both actions.' " *River Park*, 703 N.E.2d at 891 (quoting *Rodgers v. St. Mary's Hosp.*, 597 N.E.2d 616, 621 (1992)). Under this approach the outcome "depends upon the relief requested by the plaintiff: two claims may be part of the same transaction, but nonetheless still be considered separate causes of action because the evidence needed to support each claim differs." *Garcia*, 360 F.3d at 637 (citing *River Park*, 703 N.E.2d at 892). However in *River Park* the Illinois Supreme Court "unequivocally and explicitly adopted the transactional approach." *Id.* at 637; *River Park*, 703

N.E.2d at 893 ("[O]ur approval of the transaction test necessitates a rejection of the same evidence test.").  Under the "less restrictive and more pragmatic transactional approach, 'the assertion of different kinds of theories of relief still constitutes a single cause of action if a single group of operative facts give rise to the assertion of relief.' " *Garcia*, 360 F.3d at 637 (quoting *River Park*, 703 N.E.2d at 891) (internal quotations omitted).

As explained above, both the administrative proceedings before the Circuit Court and this case arise from the same core of operative facts—the Board's decision to terminate Young-Gibson's employment as principal of Julian Percy High School.  Therefore, Young-Gibson's federal causes of action will constitute the same cause of action as her administrative appeal. *See, e.g., Abner v. Ill. Dept. of Transp.*, 674 F.3d 716, 720–22 (7th Cir. 2012) (plaintiff's Title VII claims barred by res judicata because the plaintiff could have raised them in his state administrative proceedings); *Garcia*, 360 F.3d at 634 (plaintiff's claims in federal court were barred because plaintiff "could have joined [his] civil-rights claims with his administrative appeal" which included Title VII and Section 1981 claims because state courts have concurrent jurisdiction over such claims); *Durgins v. City of East St. Louis, Illinois*, 272 F.3d 841, 843–44 (7th Cir. 2001) (stating that Illinois law "permits constitutional claims … to be joined with administrative-review proceedings and explored in discovery" and res judicata would apply to later actions based on constitutional claims that were not raised during administrative review); *Pirela*, 935 F.2d at 912 (state administrative review of discharge proceedings before local board of police and fire commissioners precluded subsequent Title VII claim that discharge constituted race and national origin discrimination); *see also Stykel v. City of Freeport*, 742 N.E.2d 906, 915 (Ill. App. Ct. 2001) (holding that "causes of action for civil rights violations by an administrative agency and other constitutional challenges are not preempted by the Review Law and may be

joined with an action for administrative review"); *Smith v. Nolan*, 648 F.Supp. 972, 977 (N.D. Ill. 1986) (finding that a review of a decision of the police merit board would be final for res judicata purposes but that the plaintiff could litigate in federal court since plaintiff attempted to raise the federal claims before the merit board and the board declined to address the claims).

Young-Gibson also maintains that res judicata should not apply because she could not raise her federal claims in the Circuit Court until after exhausting her administrative remedies.[3] This argument is unpersuasive. However, "[t]he administrative process through which a federal civil-rights claim must traverse before a court can exercise jurisdiction does not negate a court's ability to *eventually* exercise that jurisdiction." *Garcia*, 360 F.3d at 639 (emphasis in original). In *Garcia*, the court recognized that there was "conflicting Illinois case law regarding whether federal civil-rights claims may be joined as independent causes of action with administrative appeals heard by Illinois circuit courts prior to the exhaustion of Illinois' administrative process for civil-rights claims." *Id.* However, the court found the manner in which the Illinois courts would resolve the issue "immaterial" to the court's res judicata inquiry, holding that "[b]ecause Illinois circuit courts could have exercised jurisdiction over Garcia's federal civil-rights claims (either directly or after Garcia exhausted available administrative remedies), Garcia could have joined those civil-rights claims with his administrative appeal of the Board's decision." *Id.* Thus under *Garcia*, it is of no consequence for res judicata purposes that Young-Gibson had not exhausted her administrative remedies before seeking review in the Circuit Court.

Furthermore, the fact that Young-Gibson may have been waiting for her right-to-sue letter does not thwart the application of res judicata. *Garcia*, 360 F.3d at 642 ("The practical

---

[3] Young-Gibson alleges she received her right to sue letter from the Illinois Department of Human Rights ("IDHR") on October 26, 2010, one day after the Circuit Court entered its ruling in her favor.

difficulties of exhaustion will not prevent res judicata from applying."). Such issues have been deemed "largely inconsequential" to the res judicata analysis because the "circuit could would *eventually* be able to exercise jurisdiction once the state administrative process—and *ipso facto*, the federal administrative process—was completed." *Id.* The Seventh Circuit recently elaborated on this concept:

> [T]he [plaintiffs] argue—without citation to authority—that as a practical matter it was impossible for them to preserve their Title VII claims because they were waiting for their right-to-sue letters from the EEOC. We have repeatedly rejected this argument. We have held that a litigant in this position has at least five options to preserve his claim: (1) he can ask the EEOC or its state counterpart to accelerate the administrative process; (2) he can seek an agreement with his former employer not to plead the statute of limitations; (3) he can agree with his employer to split a single claim into two or more suits; (4) he can delay the filing of the first suit until the last possible moment; or (5) he can request that the court postpone or stay the first case until he receives the right-to-sue letter.

*Palka v. City of Chicago*, 662 F.3d 428, 438 (7th Cir. 2011) (citing and quoting *Czarniecki v. City of Chicago*, 633 F.3d 545, 550–51 (7th Cir. 2011), *Brzostowski v. Laidlaw Waste Sys., Inc.*, 49 F.3d 337, 339 (7th Cir. 1995), and *Herrmann*, 999 F.2d at 225); *see also Govern v. City of Chicago*, No. 06 C 2678, 2008 WL 4126728, at *7 (N.D. Ill. Sept. 4, 2008) ("[T]he Seventh Circuit has directly addressed this issue and explicitly held that a plaintiff cannot use the fact that she had not received a right-to-sue letter, or that she had not filed her charge with the EEOC, to defeat res judicata."). Young-Gibson did not avail herself to any of these options cannot now use the previous absence of a resolution to her administrative proceedings to split her claims between the state and federal courts.

## B. Final Judgment on the Merits

Nevertheless, the doctrine of res judicata does not bar Young-Gibson's claims because neither the Circuit Court of Cook County nor the Illinois Appellate Court reached a final

judgment on the merits of her breach of contract claim.[4]  For purposes of res judicata, "a final order is one that 'disposes of the rights of the parties either with respect to the entire controversy or some definite and separate portion thereof.' " *In re Estate of Yucis*, 890 N.E.2d 964, 970 (Ill. App. Ct. 2008) (quoting *Arachnid, Inc. v. Baell*, 569 N.E.2d 1273, 1277 (Ill. App. Ct. 1991)).

Here, the Board concedes that the trial court did not rule on its breach of contract claim but maintains that the Illinois Appellate Court "implicitly resolved" the claim when it ruled that the Board did not violate the School Code in terminating Young-Gibson's employment.  This is incorrect.  In truth, the Illinois Appellate Court determined it had jurisdiction over the Board's interlocutory appeal under Illinois Supreme Court Rule 307(a)(1).  *See Young-Gibson*, 959 N.E.2d at 759.  Under Illinois law, the scope of review on interlocutory appeal "is normally limited to an examination of whether the trial court abused its discretion in granting or refusing the relief requested."[5] *Hamlin v. Harbaugh Enterprises, Inc.*, 755 N.E.2d 993, 996 (Ill. App. Ct. 2001); *see also City of Waukegan v. Illinois E.P.A.*, 791 N.E.2d 635, 646 (Ill. App. Ct. 2004) ("Generally, the scope of our review in an appeal brought pursuant to Rule 307 is limited to determining whether there was a sufficient showing made to the trial court to sustain its order.") (citing *Crain v. Lucent Tech. Inc.*, 739 N.E.2d 639 (Ill. App. Ct. 2000)).  Accordingly, only Young-Gibson's administrative review count (Count I) was before the Illinois Appellate Court on interlocutory appeal. The court did not—and indeed could not—issue a final judgment on Count II of Young-Gibson's circuit court complaint.

---

[4] While the parties agree that the Illinois courts did not explicitly resolve Young-Gibson's breach of contract claim, neither party has apprised the Court of the current status of the pending claim in state court.

[5] "An exception to this limited scope arises when a question of Federal preemption is raised." *Zurich Ins. Co. v. Raymark Ind., Inc.*, 572 N.E.2d 1119 (Ill. App. Ct. 1991) (citing *People v. Kerr-McGee Chemical Corp.*, 492 N.E.2d 1003 (Ill. App. Ct. 1986)).  No such question is raised here.

However under Illinois law, the res judicata inquiry does not automatically come to an end simply because the previous court failed to render final judgment on every count before it. Even if only a portion of a case was dismissed in an earlier proceeding, Illinois's rule against claim splitting prohibits plaintiffs from later instituting new causes of action arising from the same operative facts. *Rein v. David A. Noyes & Co.*, 665 N.E.2d 1199, 1207 (Ill. 1996) ("The principle that *res judicata* prohibits a party from later seeking relief on the basis of issues which might have been raised in the prior action also prevents a litigant from splitting a single cause of action into more than one proceeding."). However, where several claims proceed under "a single theory of recovery," the "dismissal of certain allegations … does not terminate litigation between the parties on the merits or dispose of the rights of the parties on a separate branch of the controversy." *Piagentini*, 901 N.E.2d 986, 994 (Ill. App. Ct. 2009) (citing *Rice v. Burnley*, 596 N.E.2d 105, 107–08 (Ill. App. Ct. 1992)). Thus if a court disposes of only certain allegations that do not constitute a "definite and separate portion" of the case, Illinois litigants may refile their claims at a later time. *Id.* An order disposes of a separate branch of a controversy—and is thus considered a final judgment on the merits—where "the bases for recovery of the counts which are dismissed [are] different from those which are left standing." *Id.* at 993 (citing *Rice v. Burnley*, 596 N.E.2d 105, 107 (1992)).

Accordingly, in order to determine whether res judicata applies in this case, the Court must determine whether Young-Gibson's administrative review count asserted a different "basis of recovery" from her breach of contract claim. Bases of recovery are considered different where "the grounds for recovery under the various counts arise from different statutes or common law doctrines or when different elements are required to recover under different theories." *Wilson v. Edward Hosp.*, 981 N.E.2d 971, 979 (Ill. 2012) (citing *Rice*, 596 N.E.2d

15

105) (rejecting defendant's "argument that actual agency and apparent agency are 'separate and distinct, stand-alone legal theories of recovery,' " finding that the "trial court's grant of partial summary judgment on actual agency merely removed some of the allegations against the [defendant]" but "did not dispose of the rights of the parties on a separate branch of the controversy"); *Rice*, 596 N.E.2d at 108 (dismissal of some negligence counts where surviving counts alleged different acts and omissions did not constitute a final judgment on the merits because plaintiff advanced only one theory of liability (negligence) and was required to establish the same elements with respect to each count of her complaint); *see also Howard v. Cybulski*, 2011 WL 10068801, at *3 (Ill. App. Ct. 2011) (unpublished)[6] (dismissal in favor of defendants on Count I, which was premised on the principle of *res ipsa loquitur*, "did not constitute a final adjudication on the plaintiffs' negligence claim" because "*res ipsa loquitur* was not a separate theory of recovery" but rather a "rule of evidence that gives rise to an inference or presumption of negligence by circumstantial evidence").

Here, while the allegations in Young-Gibson's state law complaint are framed under two separate counts ("Breach of Contract" and "Administrative Review"), both claims allege the same exact theory of recovery. With respect to Young-Gibson's administrative review count (Count I), the Illinois Appellate Court determined the "primary dispute" to be "whether the trial court erred in finding that the Board must use the procedures outlined in section 34-85 of the Code to removal a principal under section 34-8.3(d)." *Young-Gibson*, 959 N.E.2d at 759. Young-Gibson argued on appeal that a hearing under section 34-85 was required because the reasons set forth by the Board for her removal, such as her failure to implement the school

[6] Illinois Supreme Court Rule 23(e)(1) provides that unpublished opinions are not precidential and may not be cited by any party "except to support contentions of double jeopardy, *res judicata*, collateral estoppel or law of the case." ILCS S. Ct. Rule 23(e)(1).

improvement plan and comply with certain provisions of her contract, are referenced as "for cause" grounds for removal under section 34-85. *Id.* Young-Gibson's breach of contract claim asserts the same theory of recovery. Specifically, Young-Gibson alleges in Count II that the Board breached its contract with her by not adhering to the process set forth in section 34-85 when removing her for cause pursuant to section 34-8.3 without a hearing. (Circuit Court Complaint, Dkt. No. 34-1, ¶¶ 3–7.) Because Young-Gibson's theories of recovery under Count I and Count II are identical, the holding on interlocutory appeal with respect to Count I did not "dispose[] of a definite and separate portion of the controversy." *Wilson*, 981 N.E.2d at 980. Accordingly, the Illinois Appellate Court's decision does not constitute a final order and the doctrine of res judicata does not apply.[7]

## II. Title VII Race and Gender Discrimination

While Young-Gibson's claims survive the Board's res judicata challenge, they cannot withstand summary judgment. A plaintiff in a Title VII case may prove a claim of race and gender discrimination or retaliation under either the direct method of proof or the indirect method. *See Montgomery v. American Airlines*, 626 F.3d 383, 393 (7th Cir. 2010); *Weber v. Universities Research Ass'n*, 621 F.3d 589, 592 (7th Cir. 2010). Under the direct method, Young-Gibson must use either direct or circumstantial evidence to prove the Board's employment decision was the result of discrimination. *See Montgomery*, 626 F.3d at 393;

---

[7] Young-Gibson's allegations are also not barred under the doctrine of collateral estoppel. Generally, collateral estoppel prohibits the relitigation of any settled issue that was necessary to the prior final judgment. Under Illinois law, collateral estoppel applies where: (1) the issue decided in the prior adjudication is identical to the issue presented in the present suit; (2) a final judgment was entered on the merits in the prior adjudication; and (3) the party against whom estoppel is asserted was a party to or in privity with a party to the prior adjudication. *Gumma v. White*, 833 N.E.2d 834, 843 (Ill. 2005). Collateral estoppel does not apply in this case because there is no final judgment on the merits and no evidence that any issues Young-Gibson raises in this Title VII suit were actually litigated in her state court proceedings.

*Phelan v. Cook Cty.*, 463 F.3d 773, 779 (7th Cir. 2006). While direct evidence "does not require a virtual admission of illegality" or an explicit reference to the plaintiff's protect status, *Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1044 (7th Cir. 2009), it is typically found in the form of an admission by the decision maker that he acted upon a discriminatory animus. *Phelan*, 463 F.3d at 779. Circumstantial evidence generally comes in two forms: "(1) ambiguous statements or behavior toward other employees in the protected group that taken together allow an inference of discriminatory intent, and (2) evidence of systematically better treatment of employees outside the protected class." *Montgomery*, 626 F.3d at 393 (7th Cir. 2010). Young-Gibson has offered no admissions that could be construed as direct evidence of discrimination or retaliatory motive. Nor has she put forth evidence of ambiguous statements toward other employees in the protected group or evidence that employees outside the protected class were systematically treated better. As such, the Court will analyze Young-Gibson's claims under the indirect method.

The indirect method of proof requires Young-Gibson to affirmatively establish a *prima facie* case of race and gender discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). To establish a *prima facie* case of race or gender discrimination under Title VII, Young-Gibson must prove (1) that she is a member of a protected class; (2) that she was meeting the Board's legitimate employment expectations; (3) that she suffered an adverse employment action; and (4) that the Board treated similarly situated employees not within Young-Gibson's class more favorably than they treated Young-Gibson. *See Montgomery*, 626 F.3d at 394; *Weber*, 621 F.3d at 593; *Goodwin v. Board of Trustees of University of Illinois*, 442 F.3d 611 (7th Cir. 2006); *LaFary v. Rogers Group, Inc.*, 591 F.3d 903, 907 (7th Cir. 2010). If Young-Gibson is able to make out a *prima facie* case, the burden shifts to the Board to identify a legitimate, nondiscriminatory reason for the adverse employment action.

18

*See id.* If the Board can meet that burden, summary judgment in its favor is proper unless Young-Gibson can show that the Board's proffered reason is pretextual and that her race and gender were the real reasons for her termination. *See id.*

With respect to the first element, it is undisputed that Young-Gibson is a black female and therefore a member of a protected class. Young-Gibson has also satisfied the third element, that she suffered an adverse employment action because she was terminated as principal of Julian High School. (Def. 56.1 ¶ 21.) The Board argues, however, that Young-Gibson is unable to prove the second and fourth elements of her *prima facie* case under Title VII. Specifically, the Board asserts that Young-Gibson cannot show she was meeting the Board's legitimate employment expectations or that the Board treated similarly situated non-black female employees more favorably than they treated her.

### A.    Legitimate Employment Expectations

In order to establish a *prima facie* case for race and gender discrimination under Title VII, Young-Gibson must demonstrate that she met the Board's legitimate employment expectations. *Weber*, 621 F.3d at 593. The undisputed facts reveal that she did not. An employee who routinely exhibits disrespectful behavior towards her superiors is not satisfying her employer's legitimate employment expectations. *See, e.g., Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 300 (7th Cir. 2004) (employee with "persistent behavior and attitude problem" and "long history of volatile relations" with coworkers failed to meet defendant's legitimate employment expectations); *Hill v. Johnson*, 2012 WL 4483442 (N.D.Ill. 2012) (plaintiff who demonstrated a pattern of aggressive behavior toward coworkers failed to meet defendant's legitimate job expectations).

In this case, Young-Gibson's documented pattern of insubordination and disrespect towards her superiors demonstrates that she was not meeting the Board's legitimate employment expectations. On four separate occasions within a nine-month period, Young-Gibson behaved in such a manner as to elicit disciplinary actions by her superiors. During the relevant time period, Jerrelyn Jones was the Chief Area Officer over Julian and Young-Gibson's immediate supervisor. Jones was also CPS's Chief Executive Officer's designee to provide support to, oversee, and assess the performance of principals and administrators at high schools that were in her assigned area. In February of 2008, Jones disciplined Young-Gibson for insubordination; specifically, she disciplined Young-Gibson for refusing to cooperate with her office, the Department of Safety and Security, and the Office of High School Programs to correct student safety concerns at Julian. This discipline stemmed from Young-Gibson's refusal to accept additional resources and assistance that were being provided to address Julian's academic and safety issues.

Later that month, Young-Gibson was disciplined again because she attempted to unilaterally rescind a decision made by the CPS Chief Executive Officer, Arne Duncan. Young-Gibson received a 20-day unpaid suspension for writing a letter to Duncan telling him that she was rescinding the suspension of a Julian employee who had been suspected of carrying on an inappropriate relationship with a student. On April 23, 2008, Duncan recommended and the Board approved and issued a Warning Resolution to Young-Gibson due to her gross insubordination towards Jones and because of the letter to Duncan attempting to unilaterally rescind his suspension of the Julian employee.

Young-Gibson's pattern of insubordination and disrespect toward her superiors did not change after the suspension. In November 2008, Jones again disciplined Young-Gibson for

insubordination because she repeatedly ignored Jones' directives to address complaints of parents in a timely manner.  In the months of September and October 2008, Jones' office received numerous telephone calls or emails from parents because Young-Gibson would not respond to the parents' complaints.  These complaints included reports that: (1) students were not enrolled in classes, did not have textbooks, lockers, or identification cards; (2) a school security official "put[] their hand" on a student; and (3) a parent had arrived to meet with Young-Gibson and waited for an hour and a half to find out that Young-Gibson refused to meet with her.  Next, in November 2008 Young-Gibson sent members of her special education staff to a conference using discretionary funds after the ISBE specifically notified her not to use those funds for that conference.  This led to a 10-day unpaid suspension.  Young-Gibson's repeated insubordination and failure to implement her supervisor's directives, all of which were documented and led to actual disciplinary proceedings, demonstrate that Young-Gibson did not meet the Board's legitimate employment expectations.

Young-Gibson argues that she was meeting the Board's employment expectations because she was commended in a City Council of the City of Chicago resolution for Julian's Japanese program, receiving a $10,000 grant from the Japanese Chamber of Commerce.  This does not alter the outcome of the legitimate-expectations analysis.  Evidence of one instance of excellence is not enough to show a plaintiff met legitimate expectations, and "making *some* contribution isn't the same as making the *expected* contribution." *Martino v. MCI Comm. Serv.*, 574 F.3d 447, 454 (7th Cir. 2009) (plaintiff's failed to meet employer's legitimate employment expectations despite having "excelled" on one engagement because plaintiff, "[i]n his supervisors' eyes, was not a team player, … was not available, and … didn't take a very active role in the engagement).  Young-Gibson also points out that the graduation rate, ACT scores, and

PSAE scores of the Julian students improved during her tenure as principal.  Be that as it may, the fact remains that Julian was placed on probation by the ISBE and Young-Gibson was incapable of changing that status.  The ISBE indicated that this status was given because of the "ongoing failure to serve students according to relevant legal and regulatory standards and prolonged noncompliance with legal and regulatory requirements in the area of special education services."  The ISBE further held that Young-Gibson demonstrated a lack of attention, involvement, and oversight with respect to the special education programs and services and "demonstrated a lack of managerial expertise regarding student safety."  Pursuant to her own contract, Young-Gibson could be removed as principal if she failed to make adequate progress in correcting Julian's academic deficiencies.  While Julian may have improved in some respects, it ultimately remained on probation because it achieved only 30.6 percent of available performance points for the 2008 school year.  Student performance data demonstrated that Julian students were achieving well below district averages.  Even if Young-Gibson corrected some of Julian's problems, meeting business expectations as some aspects of her job is insufficient to establish that she met the Board's performance expectations as to every aspect of her job.  *Martino*, 574 F.3d 447; *Herron*, 388 F.3d at 300 (employee who was recognized for performing some aspects of his duties well but failed to work well with subordinates, peers, and supervisors did not meet defendant's legitimate employment expectations).

Because Young-Gibson has not shown that she was meeting the Board's legitimate job expectations, she cannot establish a *prima facie* case for race and gender discrimination under Title VII.

## B.     Similarly Situated Employees

Young-Gibson also fails to meet her burden of identifying a similarly situated employee outside of her protected class who was treated better than she. In order to satisfy this element of her *prima facie* case, Young-Gibson must point to an individual that is "directly comparable to [her] in all material respects." *Burks v. Wisconsin Dept. of Transp.*, 464 F.3d 744, 751 (7th Cir. 2006) (quoting *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 690 (7th Cir. 2002)). Factors to consider in determining whether employees are similarly situated include whether the employees: (1) had the same job description, (2) were subject to the same standards, (3) were subject to the same supervisor, and (4) had comparable experience, education, and other qualifications. *Salas v. Wisconsin Dep't of Corrections*, 493 F.3d 913, 923 (7th Cir. 2007). In addition, the similarly situated employee must display a "comparable set of failings" or have engaged in similar conduct without being subjected to the same disciplinary measures. *Burks*, 464 F.3d at 751. (*prima facie* case was not met where plaintiff could not point to a coworker with a comparable set of failings). *See also Harris v. Warrick County Sheriff's Dept.*, 666 F.3d 444, 449 (7th Cir. 2012) ("To establish that employees not in the protected class were treated more favorably, the plaintiff must show that those employees were similarly situated with respect to performance, qualifications, and conduct."); *Herron*, 388 F.3d at 301; *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000) (explaining that the similarly situated employee must have "engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them").

Young-Gibson makes little effort to point to similarly situated employees outside of her protected class. The only plausible candidates for a similarly situated employee in this case are William Hook, Anthony Spivey, and Reginald Evans, the male principals of high schools within

23

Julian's district. Young-Gibson submits that the Board's decision to terminate her without disciplining or reprimanding Hook, Spivey, or Evans is evidence of disparate treatment toward an employee who is not a member of her protected class. While there are certainly some similarities between Young-Gibson and the other three principals, Young-Gibson has not offered sufficient evidence to establish that any of the three is a similarly situated employee for the purposes of a Title VII claim. Young-Gibson and the three male principals were all within Jones' area, meaning Jones supervised all four individuals. Young-Gibson and the three male principals were also held to the same standards and requirements for academic achievement and school safety. In addition, the four principals also had comparable responsibilities and job duties.

However, Young-Gibson has not shown that any of the male principals were insubordinate, disrespectful, or hostile towards Jones or their other superiors. Young-Gibson alleges that Hook was treated better than her because he was not disciplined within his first thirty days of being a principal, but she fails to point to any misconduct by Hook warranting discipline. Neither Hook nor the other principals Young-Gibson offers as comparators were insubordinate, disrespectful, or impolite towards supervisors. Nor did any of them attempt to rescind a decision by the Board's CEO to suspend a school employee. Young-Gibson alleges that her termination was based on her race because no other Caucasian principals were asked to leave their school building in the manner she was, but she is unable to show that any other principal suffered from the same failings as her. Furthermore, Jones never received a letter from the ISBE indicating that it was placing Hook's, Spivey's, or Evans' schools on probation or criticizing their respective leadership. In fact, according to Jones, those three principals were "cooperative, welcomed any assistance or resources [her] office offered and/or provided and to [her]

knowledge no one complained that [they] did not properly respond to parent concerns." While the similarly-situated inquiry does not require "near one-to-one mapping between employees ... the employees receiving more lenient disciplinary treatment must at least share a comparable set of failings." *Harris*, 666 F.3d at 449; *see also Senske v. Sybase, Inc.*, 588 F.3d 501, 510 (7th Cir. 2009) ("Although the similarly situated concept is a flexible one, the comparators must be similar enough that differences in their treatment cannot be explained by other variables, such as distinctions in their roles or performance histories.") (citations omitted).

Simply put, no other principal in Young-Gibson's area was insubordinate towards his superiors, tried to overturn a decision made by the CEO, or ignored the concerns of parents. These differences between render Hook, Spivey, and Evans poor comparators for the purposes of the similarly-situated inquiry. Young-Gibson has failed to identify enough common features between her and the other principals to allow for a meaningful comparison that would lead a jury to infer discrimination. *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007), *aff'd* 553 U.S. 442, 128 S.Ct. 1951, 170 L.Ed.2d 864 (2008). Therefore the Court finds that Young-Gibson's efforts to compare Hook, Spivey, and Evans to herself fall far short of what is necessary under the similarly-situated inquiry.

## C. Pretext

Even if Young-Gibson was able to satisfy the elements of her *prima facie* case, she is unable to demonstrate that the Board's stated reason for terminating her employment—failure to meet district standards and overall inability—was pretext for discrimination. To show pretext, Young-Gibson must prove that the Board's proffered reason for taking the adverse action was dishonest and that the true reason was based on discriminatory intent. *Senske v. Sybase, Inc.*, 588 F.3d 501 at 507. The question in a discrimination case is not whether the employer's stated

nondiscriminatory ground for the action of which the plaintiff is correct but whether it is the true ground of the employer's action rather than being a pretext for a decision based on some other, undisclosed ground. *Forrester v. Rauland-Borg Corp.,* 453 F.3d 416, 417 (7th Cir. 2006). If Young-Gibson cannot offer this evidence directly, she must present indirect evidence challenging the credibility of the employer's reasoning. *Senske*, 588 F.3d at 507. This can be accomplished by demonstrating "either that a discriminatory reason more than likely motivated [the Board] or that [its] explanation is unworthy of credence." *Debs v. Northeastern Illinois Univ.*, 153 F.3d 390, 395 (7th Cir. 1998).

Young-Gibson cannot show that the Board's grounds for terminating her were factually baseless. When Young-Gibson became principal of Julian, two significant issues existed: (1) Julian had been on probation under the CPS Accountability Policy and (2) the ISBE had been monitoring Julian's recognition status due to persistent failure to provide special education services to students and failure to create and maintain a safe school climate. Young-Gibson was not able to solve either problem and any progress the students made during her tenure was not enough to place Julian in a non-probationary status with either the CPS or ISBE. Young-Gibson's own contract stated that she could be removed as principal before the expiration of her contract term if she failed to make adequate progress in correcting the academic deficiencies plaguing Julian. Although Julian's graduation rate, ACT scores, and literacy rate all improved while she was principal, it was not enough to get Julian up to district standards. In fact, with respect to the academic deficiencies that result in probation, Julian achieved only 30.6 percent of the available performance points for the 2008-2009 school year. It did not show sustained academic improvement needed to attain a higher achievement level for consecutive years. In other words, Young-Gibson was unable to get Julian out of the "hot seat" with the CPS and the

ISBE and the Board made the legitimate business decision to try something new. Young-Gibson maintains that her performance was not poor enough to warrant termination, but the Board was entitled to think otherwise. *See Grayson v. O'Neill*, 308 F.3d 808, 820 (7th Cir. 2002) ("[W]e are not concerned with the correctness or desirability of the reasons offered for employment decisions, but rather the issue of whether the employer honestly believes the reasons it offers.") It is not the place of this Court to decide whether the Board reached the *right* decision, so long as it was an *honest* one. *Grayson*, 308 F.3d at 820.

Furthermore, the proffered reason given by the Board doesn't even take into account the consistent insubordination displayed by Young-Gibson towards both Jones and Duncan, her previous suspensions for misconduct, or her failure to deal with parent complaints. Given Young-Gibson's history of insubordination and disrespect, her failure to pull Julian out of its probationary status, and her lack of cooperation with parents of students, she cannot show that the Board's stated reasons for terminating her were pretext for race or gender discrimination.

## III. Retaliation

Young-Gibson also alleges that the Board's decision to suspend, reassign, and ultimately terminate her was retaliation for filing a complaint with the Illinois Department of Human Rights ("IDHR") and for "standing up for T.D." by writing the letter to Duncan attempting to rescind the suspension of the Julian employee. Young-Gibson has chosen to attempt to establish retaliation through the direct method of proof. To establish retaliation under the direct method, the employee must show that: (1) she engaged in a statutorily protected activity; (2) she suffered a materially adverse action by her employer; and (3) a causal connection exists between the two. *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009). Statutorily protected activities include the filing of lawsuits and complaints about discrimination in a federal employment department.

*Stephens*, 569 F.3d at 787. To constitute an "adverse employment action" for purpose of a Title VII retaliation claim, the challenged action must be one that a reasonable employee would find to be materially adverse such that the employee would be dissuaded from engaging in the protected activity. *Lewis v. City of Chicago*, 496 F.3d 645, 655 (7th Cir. 2007).

Young-Gibson's attempt to rescind Arne Duncan's suspension of a Julian employee and decision to send special education staff members to a conference using discretionary funds do not constitute protected activity and thus cannot form the basis of her retaliation claim. In order to be protected under Title VII, a plaintiff must oppose a practice made unlawful under Title VII or make a charge, testify, assist, or participate in an investigation, proceeding or hearing under Title VII. 42 U.S.C. 2000e-3(a). In this case, Young-Gibson has failed to demonstrate that her opposition to the Board's treatment of the Julian employee suspended by then-CEO Arne Duncan was actually in opposition to race discrimination. There is no indication in the record that the suspended employee ever complained that the Board discriminated against him based on his race, nor does Young-Gibson point to any facts in the record suggesting that race motivated Duncan's decision. In fact, Young-Gibson's own letter attempting to rescind Duncan's suspension does not state or even suggest that she believed Duncan's decision was discriminatory. In any event, Young-Gibson points to no facts suggesting her decision to stand up for her co-worker is linked to her April 2009 reassignment or her October 2009 termination.[8] Similarly, Young-Gibson's and decision to send special education staff members to a conference using discretionary funds does not constitute protected activity under 42 U.S.C. § 2000e-3

---

[8] Young-Gibson's letter to Duncan is undated. However, as she received a notice of disciplinary hearing for writing the letter on February 13, 2008, it is safe to assume that the letter must have been written prior to that date. *See* Def. 56.1 St. ¶ 47.

because it does not involve an activity protected under Title VII or a Title VII investigation, proceeding, or hearing.

However, it is undisputed that the filing of the IDHR charge alleging discrimination in the workplace is protected. *Stephens*, 569 F.3d at 787. It is also clear that Young-Gibson suffered an adverse employment action when she was terminated. *Tyler v. Ispat Inland Inc.*, 245 F.3d 969, 972 (7th Cir.2001). Nevertheless, Young-Gibson's has failed to show is any causal connection between her engagement in a statutorily protected activity and the adverse employment action. A plaintiff may establish a causal link between her protected activity and the employer's action using either direct or circumstantial evidence. *Treadwell v. Office of Ill. Sec'y of State*, 455 F.3d 778, 781 (7th Cir. 2006). Direct evidence of retaliation typically requires an actor's admission of discriminatory animus, but such evidence is predictably rare. *See Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1114 (7th Cir. 2009). A plaintiff may also prevail "by constructing a convincing mosaic of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker." *Phelan v. Cook County*, 463 F.3d 773, 779-780 (7th Cir. 2006). A causal link between the protected expression and an adverse employment action may be established by showing that the protected conduct was a substantial or motivating factor in the employer's decision. *Gates v. Caterpillar*, 513 F.3d 680, 686 (7th Cir. 2008). When employment actions seem motivated by nothing other than good business judgment, no causal link will be found. *Gates*, 513 F.3d at 686. In addition, mere temporal proximity between the filing of the charge of discrimination and the action alleged to have been taken in retaliation for that filing will rarely be sufficient in and of itself to create a triable issue. *Stone v. City of Indianapolis Public Utilities Div.*, 281 F.3d 640, 644 (7th Cir. 2002).

It is clear the Board's actions were motivated by legitimate business judgment. Young-Gibson fails to point to any evidence of retaliation other than the fact that the adverse employment action occurred after the filing of her IDHR complaint. As an initial matter, Young-Gibson cannot connect her 20-day suspension in 2008 to her IDHR complaint because the suspension pre-dates the complaint by two months. Although Young-Gibson's 10-day suspension and termination postdate the filing of her IDHR complaint, any inference that could be drawn is substantially diluted by the fact that seven months elapsed after the IDHR filing before Young-Gibson was suspended eighteen months before she was terminated. Young-Gibson filed her complaint with the IDHR in April 2008 but was not terminated until October 2009. "The inference of causation weakens as the time between the protected expression and the adverse action increases." *Oest v. Ill. Dep't of Corr.*, 240 F.3d 605, 616 (7th Cir. 2001); *See, e.g., Derosena v. Gen. Bd. of Pensions & Health Benefits of United Methodist Church, Inc.*, 560 F.Supp.2d 652, 670 (N.D. Ill. 2008) (eighteen month lapse in time between plaintiff's protected activity and disciplinary action insufficient to establish causal link); *EEOC v. Yellow Freight Sys.*, 253 F.3d 943, 952–53 (7th Cir. 2001) (en banc) (six week gap between protected activity and alleged retaliation insufficient to establish inference of retaliation). In any event, "[s]uspicious timing alone is rarely sufficient to create a triable issue" as to the requisite causal connection. *Kodl v. Bd. of Educ.*, 490 F.3d 558, 563 (7th Cir. 2007) (quoting *Moser v. Ind. Dep't of Corr.*, 406 F.3d 895, 903 (7th Cir. 2005)). Thus without more, Young-Gibson's retaliation claim cannot withstand summary judgment.

## IV.    Due Process

Young-Gibson next argues that the Board deprived her of her due process rights when it reassigned her to an administrative office in April of 2009 and terminated her employment in

October 2009.  Due process requires that before a governmental entity may deprive a person of a constitutionally protected property interest, it must conduct some type of hearing accompanied by notice and an opportunity to be heard. *See Zinermon v. Burch*, 494 U.S. 113, 127 (1990). Thus before a person may be deprived of a constitutionally protected property interest in public employment, due process requires that a pre-termination hearing be held. *Cleveland Board of Ed. v. Loudermill*, 470 U.S. 532, 542 (1985).  A pre-termination hearing need not be elaborate, and the essential requirements are merely notice and an opportunity to respond, orally or in writing. *Loudermill*, 470 U.S. at 545.

With respect to her April 2009 temporary reassignment, Young-Gibson fails to identify a constitutionally protected property interest when the Board reassigned her.  Young-Gibson admits that her reassignment did not alter her salary or her benefits. *See Deen v. Darosa*, 414 F.3d 731, 734 (7th Cir. 2005) ("[A] job action that causes no pecuniary loss whatsoever does not implicate the Constitution.").  The only perk Young-Gibson lost when she was reassigned was her travel allowance.  The loss of a travel allowance, without more, does not qualify as a constitutionally protected property interest protected under the due process clause. *See Bishop v. Wood*, 426 U.S. 341, 349 (1976) ("[T]he federal court is not the appropriate forum in which to review a multitude of personnel decisions that are made daily by public agencies."); *Brown v. Brienen*, 722 F.2d 360, 365 (7th Cir. 1983) ("[T]he Constitution must not be trivialized by being dragged into every personnel dispute in state and local government."); *see also Warfield v. Adams*, 582 F.Supp. 111, 114–15 (S.D. Ind. 1984) ("The Supreme Court of the United States and the United States Court of Appeals for the Seventh Circuit have made clear that personnel actions of a magnitude less than termination do not rise to a level worthy of consideration under the due process provisions of the Constitution of the United States."); *but see Photos v. Township*

*High Sch. Dist. No. 211*, 639 F.Supp. 1050 (N.D. Ill. 1986) (finding *Brienen* language to be dicta and holding that plaintiff possessed a property interest in accrued vacation time).  Furthermore, Young-Gibson has not demonstrated that she suffered economic harm based on the removal of her travel allowance. *See Barrows*, 478 F.3d at 781 (due process clause inapplicable where plaintiff was forced to use sick and vacation days where plaintiff failed to "present sufficient evidence of an economic harm because he failed to provide an adequate loss calculation").

As for the termination of her four-year contract, the undisputed facts inarguably demonstrate that Young-Gibson was given notice and an opportunity to be heard before her October 2009 termination.  Young-Gibson received notice in July 2009 of the CEO's intent to seek the early termination of her contract, the reasons for his decision, and an opportunity to be heard. (Def. 56.1 St. ¶¶ 34, 36, 38, 41, 47, 52–53.)  At the hearing, Young-Gibson was represented by an attorney, allowed to testify, introduce documents, and call witnesses to testify on her behalf. (*Id.* ¶¶ 35, 38, 39.)  Based on this record, Young-Gibson cannot maintain that she was deprived notice and an opportunity to be heard prior to her termination.

## CONCLUSION AND ORDER

For the foregoing reasons, the Board's motion for summary judgment is granted.


_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date:  June 4, 2013